| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 CR 00400-1 |
| | ) | No. 18 CR 00400-2 |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| MICHAEL KHOMUTOV and | ) | |
| JULIA KHOMUTOV, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In December 2017, two federal agents and a translator went to the home of

Michael and Julia Khomutov in Northfield, Illinois, to interview them about their

home health-care company and to execute a search warrant on the residence. *See*

*generally* R. 36, Defs.' Am. Mot. to Suppress. The Khomutovs now move to suppress

their statements to the agents that day, arguing primarily that the statements were

involuntary and made during a custodial interrogation in which the Khomutovs

received no *Miranda* warnings. *Id.* at 8-12, 14-18.[1] The Court held an evidentiary

hearing as to Julia Khomutov's motion. For the reasons discussed below, Michael

Khomutov's motion to suppress is denied, but Julia Khomutov's motion is granted.

## I. Background

On December 7, 2017, between 7 and 8 a.m., two federal agents and a

translator went to the Khomutovs' home in Northfield: Federal Bureau of

---

[1]Citations to the record are noted as "R." followed by the docket number and the page
or paragraph number.

Investigation Special Agent Karl Kraywinkle; Special Agent Thomas Ethridge from the U.S. Department of Health and Human Services; and FBI Linguist Victor Thachenko.[2] Before knocking on the door, Ethridge turned on two separate recording devices—one in his front pocket, which had audio and video (but the video camera was blocked by the pocket's fabric); and the other, which also had audio and video, he carried in his hand and eventually placed on the Khomutovs' dining room table. Ethridge testified that he believed that the device he was carrying was turned on and recording, but he later realized that the video malfunctioned and recorded only about one or two minutes. Kraywinkle also made an audio recording of the agents' interactions with the Khomutovs that day. *See generally* R. 39-2, Gov.'s Resp. Br., Exh. B (Kraywinkle Recording).[3]

When Michael Khomutov answered the door, Ethridge identified himself as a special agent with Health and Human Services, but introduced his companions as just his partner Karl Kraywinkle, Special Agent and Victor Thachenko (the translator). R. 39-3, Gov.'s Resp. Br., Exh. C, RECO0001 at 4:09-4:21. Ethridge then asked Mr. Khomutov whether he owns Forum Health Care, Inc.; Mr. Khomutov

---

[2]Victor Thachenko, a Russian-language interpreter, did not end up speaking on any of the recordings of the agents' interactions with the Khomutovs. *See* Defs.' Am. Mot. to Suppress at 1, n.1. The term "agents" throughout this Opinion refers solely to Agents Kraywinkle and Ethridge.

[3]The government submitted audio recordings from both Ethridge and Kraywinkle as exhibits, and each party also submitted its own transcript of the interaction. Because the recordings vary in quality, and because the transcripts vary in accuracy (and are sometimes inconsistent with each other), this Opinion will alternate between the different sources depending on which is more accurate or audible at that particular point of the interaction. Note that the recordings are most clear when listened to at the highest volume, with headphones.

answered yes. *Id.* at 4:25-4:28. Ethridge then informed Mr. Khomutov that they have "been going around talking with a lotta people … that have dealt with doctors" and asked if they could "ask [Mr. Khomutov] if what they're saying is correct." *Id.* at 4:29-4:43. Ethridge went on to explain: "In essence there have been allegations that some of these doctors are doing some things and we wanna make sure that nobody's being taken advantage of … ." *Id.* at 4:44-4:51. When Ethridge asked Mr. Khomutov whether he had a few minutes to talk, Mr. Khomutov said that he was actually getting ready to leave. *Id.* at 4:56-5:02. Ethridge then assured Mr. Khomutov that they had "a lot of people scheduled" that day and Kraywinkle added that they "won't be long." *Id.* at 5:03-5:10. One of the agents, likely Ethridge, pleaded that it was "a little chilly out here." *Id.* at 5:19; *see also* R. 39-1, Gov.'s Resp. Br., Exh. A, Gov.'s Tr. at 3:14-16. Mr. Khomutov again voiced his hesitation, telling the agents that he felt "a little weird about this." Exh. C, RECO0001 at 5:20-5:23. But Ethridge continued, saying: "If you're okay, can we just get out of the cold and explain to you something?" *Id.* at 5:28-5:30. Mr. Khomutov finally acquiesced and allowed the agents inside. *See id.*

While standing in the foyer, which was located just inside the front door of the Khomutov residence, facing a staircase leading up to the second floor, the agents continued to give the impression that they were there to investigate doctors (as opposed to the Khomutovs themselves). For example, Agent Kraywinkle[4] explained

---

[4]The government's transcript attributes this statement to Ethridge, Gov.'s Tr. at 3:38-4:6, whereas the Defendants' transcript attributes it to Kraywinkle, R. 27-1, Defs.' Tr. at 7. Here, the recording sounds like the Defendants are correct (also, at the hearing, Kraywinkle

that the agents "noticed that you guys work with one of the doctors that we've received a complaint about. We wanted to ask you some questions about your experience with this particular doctor[,]" Exh. C, RECO0001 at 5:59-6:20. Ethridge added that "a lot of times the allegations are totally false and we go around and we talk to people and they say, 'I deal with that doctor. It's not true,' whatever, but we have to take every allegation against the doctor very seriously." *Id.* at 6:21-6:33.

Shortly after, still standing in the foyer, the agents asked Mr. Khomutov where his wife was. Exh. C, RECO0001 at 7:44. But there is a dispute over whether the agents already knew that Mrs. Khomutov was at home. At the evidentiary hearing, Agent Ethridge testified that, even after the agents had spoken with Mr. Khomutov at some length in the dining room, they still did not know where Mrs. Khomutov was. It is true that the recording *does* reveal that, when the agents first asked Mr. Khomutov whether Julia was at home, Mr. Khomutov first responded "no." Exh. C, RECO0001 at 7:45. But when Kraywinkle added, "she already left for work I take it?", Mr. Khomutov then answered that "she's getting ready … ." *Id.* at 7:48-7:51. The agents then responded with "oh, okay." *Id.* at 7:52-7:53. In fact, according to their testimony, neither agent saw Mrs. Khomutov leave the home during their two-hours or so of surveillance of the home before they knocked on the door. Despite this, Ethridge later testified that, although he remembered Mr. Khomutov saying something about Mrs. Khomutov maybe being upstairs, there was still confusion as to where Mrs. Khomutov was.

acknowledged that the government's transcript contains mistakes, including times when his comments were incorrectly attributed to Ethridge).

For her part, Julia Khomutov testified that, while the agents and her husband were in the foyer, she peeked out of a door at the top of the staircase, saw her husband along with the three men, and started walking towards the staircase. According to Mrs. Khomutov, Agent Kraywinkle then held up some kind of badge with his right hand, and pointed at her with his left hand, gesturing at her to go back to her room. Mrs. Khomutov testified that this all occurred in a couple of seconds. In contrast, both Ethridge and Kraywinkle deny that any gesture like that took place, or that they even saw Mrs. Khomutov while they were in the foyer. Mrs. Khomutov testified, however, that the gesture was so forceful that she interpreted it as an order. That is why she went back into her bedroom, "sat by the door, and … tried to listen to hear what's going on." She did not come back downstairs for nearly an hour and a half, when her husband went up to get her at the agents' request. *See, e.g., generally* Gov.'s Tr.

Back to the foyer: the agents testified that they were in the foyer for a couple of minutes at the most, after which the conversation moved to the Khomutovs' dining room. The recordings actually suggest that the group may have been in the foyer for 2½ to three minutes. In Kraywinkle's recording, for example, the agents entered the foyer area at around the 5:43 time-stamp mark; two minutes later, at 7:43, the agents asked Mr. Khomutov if his wife was home (and that inquiry ends at 8:06); at the 8:15 mark, Kraywinkle asked Mr. Khomutov whether they could sit down; and at 8:45, Kraywinkle resumed questioning Mr. Khomutov. *See* Exh. B at 5:43-8:45. Depending on when the group moved to the dining room—whether right after Kraywinkle's

question at 8:15 or at 8:45—the agents were in the foyer for at least 2½ minutes and maybe up to three minutes. This fact is relevant to the question of whether (and when) the alleged gesture occurred.

The questioning of Mr. Khomutov began. After around 21 minutes of answering the agents' questions, and right after watching an allegedly incriminating video of himself, Mr. Khomutov told the agents: "So, looks like this is more than just a few questions." Exh. B at 29:51-55. The agents responded that the video was, in fact, part of an investigation of "more than … just doctors"—specifically, of kickbacks. *Id.* at 29:58-30:16. After watching another video clip, Mr. Khomutov again expressed concern that "this [was] more than just a friendly knock on the door." Exh. C, RECO0004 at 1:09-1:12. After this, Agent Kraywinkle finally told Mr. Khomutov the truth: "You're right it is, this is more than us investigating doctors, this is us investigating home health agencies, more specifically, your agency … [W]hat we're seeing on these tapes, Michael … are kickbacks, aren't they?" Exh. B at 31:26-31:46; *see also* Gov.'s Tr. at 22:16-22. Agent Ethridge added: "Well, I guess why we're here today … would you agree they're kickbacks, or no?" Exh. B at 31:47-31:51; *see also* Gov.'s Tr. at 22:24-26.

Having learned the actual purpose of the agents' visit, Mr. Khomutov then told the agents, "I don't want to say anything else." Exh. C, RECO0004 at 1:38-1:41; *see also* R. 27-1, Defs.' Tr. at 29. But the interview did not end. Kraywinkle told Mr. Khomutov that, essentially, the government already had all the evidence it needs:

> And that's fine, … we can go through a lot of these, you know, we can go through times that you've given money to doctors … we already know,

Michael, what the evidence is ... and you know what the evidence is, like as well. I understand like a bit of equivocation here, ... like I can play tapes with you, I can play tapes with other people. ... I'd like to take the next step in my investigation with your help. ... [L]ook, the doctors are a big part of this ... none of this can happen without the doctors ... . I'm aware ... that you guys are paying doctors kickbacks in exchange for patient referrals. I know that that's going on.

Exh. B at 31:55-33:46; *see also* Gov.'s Tr. at 22:32-23:24. Mr. Khomutov tried to say something but was interrupted. *See, e.g.*, Gov.'s Tr. at 22:42; Defs.' Tr. at 30. Ethridge then jumped in after Kraywinkle, adding, "We know which doctors. We know what happened. Why we're here today is to find out from you, the 'why?' ... why did you do it? Did you do it because you needed the patients? Did you do it because the doctors forced you to? ... I don't know. That's ... up to you to tell us the why." Exh. B at 33:46-34:20; *see also* Gov.'s Tr. at 23:26-42. After hearing all of this, Mr. Khomutov told the agents: "I guess before I say anything ... I'd really like to know what's involved." Exh. C, RECO0004 at 4:13-4:20. Kraywinkle responded, in part: "When we talk to people, we hope to get their assistance in our investigation. ... That process starts with acknowledging what I already know to be true." *Id.* at 5:06-5:17. Ultimately, Mr. Khomutov continued speaking with the agents and answering their questions; at no point did he repeat his earlier statement that he did not "want to say anything," nor did he end the conversation or ask the agents to leave.

Throughout Mr. Khomutov's interaction with the agents, there were various references to his wife, Julia. Some of these were questions about Mrs. Khomutov's conduct in relation to the alleged kickbacks. *See, e.g.*, Exh. C, RECO0008 at 5:50-6:01; Gov.'s Tr. at 59:32-45. Other times, the agents asked to speak to Mrs. Khomutov

directly. For example, when the agents asked Mr. Khomutov whether any doctors had ever requested kickbacks from his wife, Exh. B at 23:13-23:21, Agent Kraywinkle followed up with: "I mean, uh—she's here, … would she be able to answer that question?" *id.* at 23:22-23:26.[5] A little over an hour later, while discussing a video in which Mrs. Khomutov allegedly appears, Kraywinkle told Mr. Khomutov: "I've got a tape that I can show your wife right now." *Id.* at 1:26:38-1:26:42. About a minute later, Kraywinkle added: "I'll show her … if she's upstairs, I'd be happy to show her." *Id.* at 1:27:19-1:27:22.

Shortly after, Mr. Khomutov agreed—with some trepidation—to go upstairs to get Mrs. Khomutov, but asked whether the agents were going to follow him. *See, e.g.*, Defs.' Tr. at 81. The agents responded initially that they do this for security purposes. *See, e.g.*, *id.*; Gov.'s Tr. at 72:20:26. But Kraywinkle then added: "I don't want to go upstairs if she's like not dressed … You want to check? … I'm not gonna follow you into a room … if she's not dressed or anything like that." *Id.* at 1:29:16-1:29:31. When Mr. Khomutov again expressed hesitation, Kraywinkle emphasized: "She can watch the tape, she doesn't have to say anything if she doesn't want to, you didn't have to say anything if you didn't want to … whether you decide to talk to us or not is, is your decision and Julia's decision." *Id.* at 1:29:51-1:31:37. At the same time, the agents also revealed that they were planning to execute search warrants on the Khomutovs'

---

[5]The government transcribes this portion of the audio as "Uhm, I mean if she's here. Would she, would she be able to answer that question?" Gov.'s Tr. at 18:14-16. But even when listening to the recordings at the highest volume, using headphones, and slowing down the audio to half the normal speed, the word "if" cannot be heard.

residence and business that day, but they wanted to speak to Mrs. Khomutov first. *See, e.g.*, Defs.' Tr. at 82-86.

When Mr. Khomutov finally went upstairs, Kraywinkle told him: "Okay, yeah, I'll, I'll just kind of stand up here if you don't mind." *Id.* at 1:33:28-1:33:29. Kraywinkle later testified that he did not go up the stairs, but instead walked in and out of the dining room and the foyer. On the other hand, Mrs. Khomutov testified that when she went downstairs, one of the agents was standing on the landing of the staircase— that is, the halfway point dividing the first flight of stairs from the second, *see* R. 52— and was almost ready to take a step down the stairs, but stopped when the agent saw her. Her husband went downstairs ahead of her, then she passed by the agent, and then the agent followed her down. When her husband got to the foyer, another agent started speaking to her husband, and Mrs. Khomutov testified that she clearly overheard the word "warrant."

Ultimately, the agents spoke with Mrs. Khomutov—with her husband present and at times participating—for around 52 minutes. *See* Exh. B at 1:40:07-2:32:52. When Mrs. Khomutov first entered the dining room, she asked the agents whether she could sit in a certain seat. Gov.'s Tr. at 79:25. Agent Kraywinkle told her: "This is your house. You can sit wherever you want." *Id.* at 79:29-30. But none of the agents informed Mrs. Khomutov of her right to leave, to end the conversation, to speak to an attorney, or to not answer their questions. Nor did her husband tell her this when he went upstairs. In fact, Mrs. Khomutov testified that she felt unsafe and frightened, that she thought the agents were going to kill her, that she was not free to go, and

that she thought her husband was arrested and the agents were going to arrest her, too. But despite this fear, Mrs. Khomutov pushed back against the agents at times, telling them they "got it absolutely wrong" and that they were "absolutely rude." *See* Exh. B at 2:26:45-2:26:47, 2:26:50-2:26:52.

At one point during the interview, after the agents said their team was about to execute the search warrant at the Khomutovs' office, both Julia and Michael asked if they could speak to their employees. When Agent Kraywinkle told them they could reach out to the employees when "we're done," Exh. B at 1:52:52-55, Mrs. Khomutov interrupted him to ask whether it would be "possible to maybe uh, let them go for today so they won't be scared or have questions or … ?" *id.* at 1:52:55-1:53:01. Kraywinkle seems to have misunderstood at first, saying "of course." *Id.* at 1:53:01. But when Mrs. Khomutov clarified, "can we do that before your people come?" *id.* at 1:53:08-1:53:10, Kraywinkle told her: "[W]ell, here's the deal, … I'd like to continue and finish up with the questions that I've got … [,]" *id.* at 1:53:10-15. Although some of the conversation after this is unintelligible on the recording, it is clear that the Khomutovs continued talking about their employees. A few seconds later, for example, Mrs. Khomutov said that the "people in the office … work nine to five-thirty … they're employees." *Id.* at 1:53:22-25. Although she understood that Agent Ethridge wanted "to be as discreet as possible[,]" *id.* at 1:53:26-1:53:43, she emphasized that "people don't understand and don't know what's going on[,]" *id.* at 1:53:39-1:53:45; Gov.'s Tr. at 91:20-21. Here, Agent Kraywinkle interrupted and told her: "[Y]ou'll have an opportunity to do that, I'm just like … that opportunity is not gonna come

right now." Exh. B at 1:53:45-1:53:49. While the agents did allow Mr. Khomutov to get his phone (and confirmed that Julia had hers) a few minutes later—in case any of the employees called—the agents did not at any point allow the Khomutovs to *make* a phone call. *See id.* at 1:56:05-1:56:19, 1:56:39-1:56:46.

Around 2½ hours after arriving at the Khomutov residence, the agents concluded the interview and proceeded to execute the search warrant on the home.

## II. Legal Standards

### A. Standard for Motions to Suppress

"It is a well-established rule that the burden is on the movant to make specific factual allegations of illegality, to produce evidence and persuade the court that the evidence should be suppressed." *United States v. Madison*, 689 F.2d 1300, 1308 (7th Cir. 1982) (cleaned up).[6] Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove by a preponderance of the evidence that the statement was given voluntarily. *Id.*

### B. The Admissibility of Statements from Interrogations

Under *Miranda v. Arizona*, a person who is subjected to a custodial interrogation must be informed, at the outset and "in clear and unequivocal terms," that they have the right to remain silent, the right to consult with an attorney, and the right to have counsel present during questioning. 384 U.S. 436, 468-73 (1966). These "*Miranda* warnings" were "designed to safeguard the constitutional guarantee

---

[6]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

against self-incrimination[,]" in part because "the inherently coercive nature of custodial interrogation could blur the line between voluntary and involuntary statements[.]" *United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012). "[A] suspect must be both in custody *and* subjected to interrogation before *Miranda* warnings are required." *Id.* (emphasis added).

To determine whether a person is in "custody" for purposes of the *Miranda* requirement, "the initial step is to ascertain whether, in light of the objective circumstances …, a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (cleaned up). *See also United States v. Slaight*, 620 F.3d 816, 821 (7th Cir. 2010) ("'[R]easonable' person … just means the average person, as distinct from someone of abnormal timidity[.]" (cleaned up)). The Court then must ask "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509. Like the Fourth Amendment analysis of unreasonable seizures—which also uses the free-to-leave test—an interrogation is custodial where, "by means of physical force or a show of authority, [the suspect's] freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). *See also United States v. Conrad*, 673 F.3d 728, 733 (7th Cir. 2012) (suppression is improper where the defendant was never "in custody" under the Fifth Amendment—meaning that "a reasonable person in [his] position would have believed that he was free to leave" and that "his freedom of movement was never restrained through means of physical force or a show of

authority." (cleaned up)); *United States v. Walker*, 760 F.2d 144, 146 n.1 (7th Cir. 1985) ("*Miranda* … presumes the presence of a known government agent; it is the show of authority by a known agent that supplies the initial factual predicate for a finding of 'custody.'"). A non-physical show of authority on its own makes an encounter custodial "only if the person at whom it is directed actually submits to that authority." *United States v. Griffin*, 652 F.3d 793, 798 (7th Cir. 2011) (citing *California v. Hodari D.*, 499 U.S. 621, 626 (1991)).

But even if someone is in custody for purposes of *Miranda*, "[n]ot all statements obtained by the police after a person has been taken into custody are considered the product of interrogation." *United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007) (citing *Rhode Island v. Innis*, 446 U.S. 291, 299 (1980)). An "interrogation" is limited to "express questioning" or "any words or actions on the part of the police … that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis*, 446 U.S. at 301. So, for example, if a suspect in custody revealed an incriminating fact unprompted by interrogation, then that statement would still be admissible. But a suspect's unwarned statements in a custodial *interrogation* generally must be excluded from evidence because they constitute a violation of the suspect's Fifth Amendment right against self-incrimination. *See Miranda*, 384 U.S. at 478-79. *See also Oregon v. Elstad*, 470 U.S. 298, 304-305 (1985) ("The Fifth Amendment prohibits use … of *compelled* testimony. Failure to administer *Miranda* warnings creates a presumption of compulsion. Consequently, unwarned statements that are otherwise voluntary … must … be excluded from evidence under *Miranda*.").

On the flipside, statements made in *non*-custodial interrogations must still be suppressed if they were involuntary—that is, if "the behavior of … law enforcement officials was such as to overbear [the suspect's] will to resist and bring about confessions not freely self-determined." *Beckwith v. United States*, 425 U.S. 341, 347-48 (1976) (cleaned up). And regardless of whether *Miranda* warnings were ever administered, law enforcement is required to end a custodial interrogation if the suspect unambiguously invokes their right to remain silent. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *Miranda*, 384 U.S. at 473-74. If the interrogation does continue, then the suspect's statements will be suppressed unless the government "demonstrate[s] that the defendant knowingly and intelligently waived his privilege against self-incrimination … ." *Miranda*, 384 U.S. at 475.

### III. Analysis

### A. Michael Khomutov's Motion to Suppress

### 1. Custodial Interrogation

Michael Khomutov makes several arguments in support of his motion to suppress. For one, he contends that his statements to the agents should be suppressed because they were made in a custodial interrogation, absent any receipt of *Miranda* warnings. *See, e.g.*, Defs.' Am. Mot. to Suppress at 2, 14-16. To determine whether Mr. Khomutov was in custody, the Court must first examine the circumstances surrounding the interaction, then consider whether, given those circumstances, a reasonable person in Mr. Khomutov's position would have felt free to leave. *See United States v. Borostowski*, 775 F.3d 851, 859 (7th Cir. 2014). Relevant circumstances to examine include the location and duration of the questioning,

"whether the encounter occurred in a public place, whether the suspect consented to speak with officers, whether the officers informed the suspect that he was not under arrest, whether the interviewee was moved to another area, whether there was a threatening presence of several officers and a display of weapons or physical force, whether the officers deprived the suspect of documents needed to depart and whether the officers' tone was such that their requests were likely to be obeyed." *Id.* at 859-60 (cleaned up).

Here, the facts do not support the conclusion that Mr. Khomutov was ever in custody, and no evidentiary hearing is needed to arrive at the conclusion. First, despite his initial hesitation, Mr. Khomutov voluntarily allowed the agents inside his home. The audio recording indisputably and objectively shows that Mr. Khomutov agreed to let the agents inside of the house after the agents asked a few times, mentioning the cold temperature outside. *See Dassey v. Dittmann*, 877 F.3d 297, 304 (7th Cir. 2017) ("[O]fficers may deceive suspects through appeals to a suspect's conscience, by posing as a false friend, and by other means of trickery and bluff."). So the initial entry was voluntary.

After the initial entry, as the interview progressed, Mr. Khomutov also claims that the agents yelled and raised their voices at him. Defs.' Am. Mot. to Suppress at 17. On listening to the audio recordings, however, the Court finds that the agents' voices are not raised in any unusual or threatening way (aside perhaps from a few instances when the agents were plainly trying to be heard over the Khomutovs' barking dog). *See generally* Exhs. B and C. Nor is there any reason to believe that the

agents in any way displayed their weapons or physically restrained Mr. Khomutov. *Cf. United States v. Thompson*, 496 F.3d 807, 811 (7th Cir. 2007) (the defendant was not in custody where he "invited the agents into his home and agreed to be questioned[,]" and "the agents did not raise their voices or display their weapons in an intimidating manner, nor did they physically restrain [him] in any way."). In fact, Mr. Khomutov had several chances to terminate the agents' visit even after he invited them inside. For one, the agents did not dominate the scene by, for example, wearing official uniforms, marching straight to the living room or dining room, sitting down uninvited, or otherwise setting up their equipment without permission. *See Sprosty v. Buchler*, 79 F.3d 635, 641-43 (7th Cir. 1996) (the degree to which police dominated the scene—by surrounding suspect's car, escorting him inside while wearing uniform, and searching the home first—was relevant to finding that the suspect was in custody at the time of his interrogation). Instead, the agents stood in the foyer for a few minutes until Agent Kraywinkle eventually *asked* Mr. Khomutov: "Do you mind if we sit down, that's not a problem?" Gov.'s Tr. at 5:43-44; Exh. B at 8:14-8:17. Under these objective circumstances, a reasonable person in Mr. Khomutov's position would have felt free to refuse.

Indeed, going beyond the objective circumstances, Mr. Khomutov's own conduct refutes that he believed himself to be in custody. Shortly after the group moved to the dining room, Mr. Khomutov felt comfortable enough to interrupt Kraywinkle in the middle of a question to ask for more information. Exh. B at 8:45-8:52. Kraywinkle did not respond with any threats. In response, Mr. Khomutov

makes much of the fact that the agents followed him into the kitchen when he went to get a glass of water. *See, e.g.*, Defs.' Am. Mot. to Suppress, at 1, 5, 6, 16. *Cf.* Gov.'s Tr. at 25:6-22. But—unlike the situation in *United States v. Madoch*, 149 F.3d 596, 601 (7th Cir. 1998), where the agent was present while the suspect was getting dressed and pumping breast milk in the bathroom—getting water is not so "inherently private" that it "establish[es] a custodial situation by the mere presence of a law enforcement officer." *See Thompson*, 496 F.3d at 811. A reasonable person in Mr. Khomutov's position—that is, voluntarily inviting the agents inside, maintaining control over the environment, and interrupting and questioning the agents without any reprisal, in the absence of any physical restraints, raised voices, threatening tones, or intimidating display of weapons—would have felt free to terminate the conversation or ask the agents to leave. For these reasons, Mr. Khomutov was not "in custody" for purposes of the *Miranda* analysis.

## 2. Voluntariness

Mr. Khomutov also argues that his statements should be suppressed because they were not voluntarily given. Defs.' Am. Mot. to Suppress at 8-12. Unlike custodial interrogation in the absence of *Miranda* warnings, noncustodial interrogations do not carry a presumption of coercion. *United States v. Serlin*, 707 F.2d 953, 958 (7th Cir. 1983). Instead, the relevant inquiry is whether, in light of the totality of the circumstances, the statements obtained during the interrogation were voluntary. *United States v. Ceballos*, 302 F.3d 679, 694 (7th Cir. 2002). "Is the confession the product of an essentially free and unconstrained choice by its maker? … If it is not, if

his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process." *United States v. Goldstein*, 611 F. Supp. 626, 630 (N.D. Ill. 1985) (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602-606 (1961)). In other words, in noncustodial interrogations where federal agents behaved in such a way as to "overbear [a suspect's] will to resist and bring about confessions not freely self-determined," the suspect's statements must be suppressed. *Beckwith*, 425 U.S. at 347-48. That did not happen here.

Neither Mr. Khomutov's will to resist the agents' questions nor his ability to make a rational decision were ever in serious danger. Mr. Khomutov argues that the agents violated his constitutional rights by pretending to be auditors for "many minutes before [they] even hinted at the fact that they were … investigating criminal wrongdoing." Defs.' Reply at 2-3. *See also* R. 41-1, Defs.' Reply Br., Exh. 1, M. Khomutov Aff. But "[t]rickery, deceit, even impersonation do not render a confession inadmissible," not even in custodial situations, "unless government agents make threats or promises." *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001). "Simple failure to inform [a] defendant that he was the subject of the investigation, or that the investigation was criminal in nature, does not amount to affirmative deceit unless the defendant inquired about the nature of the investigation and the agents' failure to respond was intended to mislead." *Serlin*, 707 F.2d at 956. Ultimately, a law-enforcement agent may "'actively mislead' a suspect prior to obtaining a statement or confession so long as a rational decision remains possible." *United States v. Montgomery*, 555 F.3d 623, 632 (7th Cir. 2009).

Here, there is no evidence that the agents threatened or promised Mr. Khomutov anything before telling him that he was under criminal investigation. *See* Exh. B at 0:00-31:46. Nor is there any evidence to suggest that the agents' misrepresentations somehow overcame Mr. Khomutov's free will. In fact, and despite Mr. Khomutov's arguments to the contrary, the agents' statements and questions all but announced the criminal nature of their investigation. Very early in the interview, Agent Kraywinkle explicitly identified himself as "with the FBI" and both agents provided Mr. Khomutov their business cards. *Id.* at 8:52-9:39. A reasonable person in Mr. Khomutov's position—a business owner who at that point had been living in the United States for around 25 years, and who spoke and understood English well— would know that the "FBI" is a law enforcement agency. Moreover, not only did the agents ask questions about Mr. Khomutov's home healthcare company, but they also specifically asked him whether he (or his wife, or any employees) ever paid doctors kickbacks in exchange for patient referrals. *See, e.g.*, Gov.'s Tr. at 9:27-28 ("How about the clinical decisions? Like who makes those at Forum?"); Exh. B at 14:24-14:45 ("[D]oes Forum give any sort of cash to doctors for referrals? … To the best of your knowledge, uh, have you ever done it? Has Julia ever done it? … any marketers and nurses or anybody working at Forum … have they ever given to a kickback to the doctors?"). On top of this, Kraywinkle also explained to Mr. Khomutov that the allegations were based on the anti-kickback statute, which "makes it *illegal* to … accept, to give, to solicit, or to offer anything of value." Exh. B at 21:22-21:48 (emphasis added). These explanations and pointed questions came early in the

interview, and "would have alerted even the most unsuspecting [interrogee] that he was, at least partly, the focus" of the investigation, *Serlin*, 707 F.2d at 957, and also that the investigation was criminal in nature, *see id.*

What's more, when Mr. Khomutov *did* express concern and inquired—vaguely—about the nature of the investigation—telling the agents that it "looks like this is more than just a few questions[,]" Exh. B at 29:51-55, and "more than just a friendly knock on the door[,]" Exh. C, RECO0004 at 1:09-1:12—the agents truthfully told him that he was a target, Exh. B at 31:26-31:46. So not only did the agents' early, revealing statements undermine the notion that they engaged in deceit, the totality of the circumstances—the agents' candor in response to Mr. Khomutov's questions, the absence of any threats or promises, the tone of the conversation—does not suggest that Mr. Khomutov's free will or ability to make a rational decision were in any way overborne by the agents' interrogation style. *See Kontny*, 238 F.3d at 818 ("Even if [an agent] was pretending to be conducting a civil investigation but was really … conducting a criminal one, this would not … make the statements inadmissible[,]" if the circumstances did not prevent the suspect "from making a rational decision about whether to play ball … ."). *See also United States v. Hocking*, 860 F.2d 769, 775 (7th Cir. 1988) (vigorous, persistent questioning, without more, does not render a statement or confession involuntary), *partially overruled on other grounds*, *United States v. Levy*, 955 F.2d 1098, 1103-1104 n.5 (7th Cir. 1992).

### 3. Invocation of Right to Remain Silent

Mr. Khomutov also argues that he invoked his *Miranda* right to remain silent, and requests that the Court suppress any statements he made after that invocation. Defs.' Am. Mot. to Suppress at 13-14. *Cf. Michigan v. Moseley*, 423 U.S. 96, 104 (1975) (once a suspect has decided to remain silent, law enforcement must scrupulously honor the suspect's right to cut off questioning). Again, however, *Miranda* rights apply only in the context of *custodial* interrogation. *See United States v. LaGrone*, 43 F.3d 332, 337 (7th Cir. 1994). Because the Court has already found that Mr. Khomutov was not in custody, the invocation would not matter.

### B. Julia Khomutov's Motion to Suppress

Turning to Julia Khomutov's motion, the Court concludes that her statements to the agents must be suppressed. Mrs. Khomutov's motion rests primarily on the argument that she was subject to custodial interrogation without being given *Miranda* warnings. *See* R. 45, J. Khomutov's Supp. to Defs.' Reply Br. at 2-3. Like her husband Michael, Mrs. Khomutov was clearly interrogated by the agents. After she came down to the dining room, the agents questioned her for almost an hour and asked her potentially incriminating questions about whether she accepted or solicited kickbacks in exchange for patient referrals. *See* Exh. B at 1:40:07-2:32:52; *id.* at 1:43:06-1:43:16 ("You've talked to doctors about … those kinds of arrangements … and you've participated in, in paying those kickbacks in the past, right?"). *See also Innis*, 446 U.S. at 301. The real question then, is whether Mrs. Khomutov was "in custody" for purposes of the *Miranda* analysis.

## 1. The Alleged Gesture

The starting point for the in-custody analysis is whether Agent Kraywinkle used a physical gesture to essentially order Mrs. Khomutov back into her bedroom soon after the agent walked into the house. On review of the circumstantial evidence from the transcripts and audio recordings, along with Mrs. Khomutov's testimony—even if at times exaggerated—the Court finds that Kraywinkle did use a physical gesture and his badge to direct Mrs. Khomutov back into her bedroom.

Specifically, Mrs. Khomutov credibly testified that after the agents entered the foyer, she started walking towards the staircase from an upstairs room, at which point Agent Kraywinkle held up "some kind of badge" with his right hand, and forcefully gestured at her with his left hand "to go back to my room." Interpreting this gesture as an order, she obeyed and went to the bedroom, where she sat by the door and tried to listen to what was going on. This factual allegation is crucial to Mrs. Khomutov's argument—without it, the totality of the circumstances surrounding her interactions with the agents would not be so different from her husband's, who, as previously established, was not in custody. Because both agents deny that any gesture like that happened, or that they ever saw Mrs. Khomutov while in the foyer, the comparative credibility of the witnesses and the circumstantial evidence surrounding the events are particularly important.

First, the government's assertion that the transcript and the agents' testimony disprove Mrs. Khomutov's account of the gesture is incorrect. The evidence strongly suggests that, at the very least, Agent *Kraywinkle* did know that Mrs. Khomutov was

upstairs. While the agents were still in the foyer, just a few minutes after arriving to the residence, Kraywinkle asked Mr. Khomutov whether his wife already left for work. Exh. C, RECO0001 at 7:48-7:51. Although the quality of the recording here is not crystal clear, Mr. Khomutov can be heard responding that his wife was still getting ready. *Id.* Around 15 minutes later, when discussing whether any doctors had ever asked for kickbacks from Mrs. Khomutov, Kraywinkle referred to Mrs. Khomutov's presence by asking, "I mean, uh-*she's here*, … would she be able to answer that question?" Exh. B at 23:22-23:26 (emphasis added). Then, over an hour later, Kraywinkle told Mr. Khomutov, "I've got a tape that I can show your wife *right now*. … I'll show her … if she's upstairs, I'd be happy to show her." *Id.* at 1:26:38-1:27:22 (emphasis added). Shortly after that, Kraywinkle again referred to Mrs. Khomutov as being upstairs by asking, "may I go ask her to come down?" *Id.* at 1:33:24-1:33:27. These statements and questions suggest that Kraywinkle already knew that Mrs. Khomutov was upstairs.

In closing argument, the government contended that because the agents asked where Mrs. Khomutov was, the agents could not have already known she was there in the house. There are several problems with this argument. First, the agents' direct questions about Mrs. Khomutov's location came very early in the interview, when they were still in the foyer. Exh. C, RECO0001 at 7:45-8:06. The agents moved to the dining room at the 8:15 minute mark of the recording at the earliest, or 8:45 at the latest. *See supra* Section I. This means that Kraywinkle could have gestured at Mrs. Khomutov *after* the inquiry as to her whereabouts ended at 8:06 (especially given

Mrs. Khomutov's testimony that the gesturing incident took only a couple of seconds). Second, even if Kraywinkle had already seen Mrs. Khomutov when he asked where she was, it is not unusual for agents to test an interviewee's truth-telling on basic facts in order to gauge their overall honesty. And, as discussed above, Kraywinkle's later statements and questions reveal that he probably *did* know that Mrs. Khomutov was in the house.[7]

On top of the agent's references to Mrs. Khomutov's presence as captured on the audio recording, there is another fact that is hard to square with no-badge-and-gesture: if the agent did *not* show his badge and make the gesture, why would Mrs. Khomutov decide to stay upstairs for such a long time—more than 90 minutes—and just sit there in the room trying to listen in? Her husband and three strangers are walking into the dining room, and instead of going downstairs and asking what's happening, she decides to retreat into her room for over an hour and a half? That does not make very much sense. One remote possibility is that Mrs. Khomutov was frightened, but that would mean she was just leaving her husband alone to face whatever was happening downstairs. No—seeing the agent show his badge and gesture her back into the room is the most likely explanation for why Mrs. Khomutov

---

[7]The government also seemed to argue in closing that the agents directly asked about Mrs. Khomutov's whereabouts throughout the interview, not just when they entered the foyer. This view is not supported by the transcripts or recordings. Although Kraywinkle did say, "if she's upstairs, I'd be happy to show her[,]" Exh. B at 1:26:38-1:27:22, taken in context with the rest of his statements, this was more likely a statement of acknowledgement than a question. In fact, Kraywinkle's direct questions in those instances were focused on actually speaking to Mrs. Khomutov—asking, for example, "[m]ay I show the tape to Julia?" Gov.'s Tr. at 71:38.

did not leave her bedroom (until her husband personally came to get her at the agents' request).

Another circumstantial fact in favor of finding that the gesture and the badge-display happened is that, right after Mrs. Khomutov was eventually summoned to the dining room for questioning, she felt the need to first ask the agents for permission to sit down in her own dining room. That show of submission lends credence to Mrs. Khomutov's assertion that the gesture and the badge-display did happen, because she would not have asked for permission to sit if she did not feel that her freedom was restrained. It is true that a suspect's subjective feelings are not part of the objective analysis of whether a reasonable person would feel that she is in custody. But subjective feelings *can* serve as circumstantial evidence of other facts. Here, the fact that Mrs. Khomutov initially felt so constrained that she had to ask for permission to sit down is relevant to finding that the agent made the physical gesture and showed her his badge.

In sum, Mrs. Khomutov testified credibly about the badge-display and gesture, and taken together with the circumstantial evidence, the Court finds that the agent showed his badge to her and gestured her back into her bedroom.[8]

---

[8] It is worth noting that the Court is *not* finding that, at the evidentiary hearing, Kraywinkle intentionally misstated that he showed the badge to Mrs. Khomutov and made the gesture. It would not be surprising that Kraywinkle simply misremembered that fleeting moment: the hearing took place almost two years after the December 2017 encounter; the badge-display and gesture took all of a couple of seconds (if that); and what Kraywinkle did was an ordinary (even instinctual) law-enforcement tactic of separating interviewees, at least initially, and managing the setting as much as practicable.

## 2. In Custody

Having found that Agent Kraywinkle showed his badge to Mrs. Khomutov and gestured at her to return to the bedroom, the question now is whether the circumstances were so coercive that a reasonable person in Mrs. Khomutov's position would not have felt free to leave or disobey. *See Howes*, 565 U.S. at 509. The Court finds that it was.

At the evidentiary hearing, Mrs. Khomutov provided a credible demonstration of what the gesture looked like—raising up her right hand as if holding a badge, and forcefully pointing with her left hand and sweeping it to the side in a sharp, authoritative manner. Unlike her husband, Mrs. Khomutov did not have the benefit of speaking with the agents, hearing their normal tone of voice, and choosing whether to let them inside. She only heard loud banging on the door very early in the morning, and then saw three strangers inside her home. To a certain degree, the unexpected presence of strangers in the privacy of one's own home and at such an early hour increases the level of intrusiveness and intensifies the coercive effect of a gesture of authority. *See United States v. Jerez*, 108 F.3d 684, 690 (7th Cir. 1997) (considering "the particular intrusiveness of nocturnal encounters with the police at one's dwelling" in the totality of circumstances when determining whether seizure occurred); *see also United States v. Reeves*, 524 F.3d 1161, 1169 (10th Cir. 2008) ("This encounter began between 2:30 and 3:00 in the morning, a time which must be taken into consideration when analyzing the coerciveness of the encounter."). A reasonable person in Mrs. Khomutov's position would not have felt free to ignore such a forceful

gesture, especially when accompanied with an official badge. *See United States v. Black*, 675 F.2d 129, 134-35 (7th Cir. 1982) ("[I]f officers have intimidated an individual through the use of a show of authority sufficient to make it apparent that the individual is not free to ignore the officer and proceed on his way, a seizure will be found."). *Cf. Hocking*, 860 F.2d at 773 ("Although the agents did ask Mrs. Hocking to leave the living room where the interview was conducted, they did so politely and with good reason. At no time did the agents display their weapons or make any threatening gestures or statements to Hocking or his wife.").

The circumstantial evidence also suggests to a finding of custody. At the evidentiary hearing, Mrs. Khomutov testified that when her husband went upstairs to get her, he told her that the agents were ready for her. When she was getting dressed, she heard the agents yelling up for "Michael" in a loud and somewhat aggressive voice. When Mrs. Khomutov came out of the bedroom, she saw that one of the agents had gone halfway up the stairs and was waiting on the landing. Her husband went down the stairs first, and then when she passed by the agent, the agent followed her. She then heard another agent discussing a "warrant" with her husband. In contrast, both agents testified that they did not go up the stairs, and for his part, Agent Kraywinkle also testified that he actually walked in and out of the dining room and the foyer while waiting.

Here, it is worth noting that neither of the versions reported by Mrs. Khomutov and Agent Kraywinkle is 100% accurate. With regard to Mrs. Khomutov, she submitted two affidavits that are inconsistent with each other—in the first, she

claims that *two* agents came upstairs with her husband, whereas in the second, she only talks about one agent. *Compare* R. 41-2, J. Khomutov Aff. No. 1, *with* R. 42, J. Khomutov Aff. No. 2. (The first affidavit is also inconsistent with her testimony). Meanwhile, Kraywinkle's testimony that he did not go up the stairs to the landing is undermined by the audio recording, where he can be heard telling Mr. Khomutov, "I'll just kind of stand *up here* if you don't mind." Exh. B at 1:33:28-1:33:29 (emphasis added). It does not make sense for Kraywinkle to advise Mr. Khomutov of his position, or to use the word "up," if he only walked a few steps into the foyer. Because the audio recording suggests that at least one agent *did* go up the stairs, the inconsistency in Mrs. Khomutov's statements is not all that important. Ultimately, a reasonable person in Mrs. Khomutov's situation—after an agent showed his badge and forcefully gestured her back into the room, law enforcement agents called loudly for her husband, and she was essentially escorted to her own dining room—would not have felt free to leave (or to ask the agents to do so). *See Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004) ("[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances.").

What's more, the agents' conduct and statements while interrogating Mrs. Khomutov also suggest that the interaction was custodial. When Mrs. Khomutov entered the dining room, she saw the agents' laptops and other equipment already laid out on the table (likely including a video camera, per Ethridge's testimony). More importantly, before questioning began, none of the agents informed Mrs. Khomutov of her right to leave, to end the conversation, to speak to an attorney, or to not answer

their questions. Had they done so, the interrogation might have turned noncustodial at that point.

The government argues that one of the agents did tell Mrs. Khomutov, in effect, that she was free to leave. When Mrs. Khomutov asked the agents for permission to sit down in the dining room, Agent Kraywinkle responded, "This is your house. You can sit wherever you want." Gov.'s Tr. at 79:29-30. Although the response is courteous enough, it is *not* the same as informing Mrs. Khomutov that she could end the conversation or ask the agents to leave the house. If anything, as explained earlier, Mrs. Khomutov's request for permission supports the notion that she had seen the badge and the forceful gesture to return to her room. Indeed, later in the interview, the agents again constrained her freedom: when Mrs. Khomutov asked if she could call her employees to tell them about the imminent execution of the search warrant at the business, the agents did not let her. Although Kraywinkle did initially say "of course" in response to the question, after Mrs. Khomutov clarified that she wanted to call *before* the execution of the warrant, the agents said that that "opportunity is not gonna come right now" and that they wanted to "finish up with [their] questions" first. Exh. B at 1:52:41-1:53:49. Despite the occasional unintelligible word or phrase, and especially considering that this specific interaction only took around 68 seconds, the context of the conversation is clear: the agents refused to allow Mr. Khomutov to make a phone call. Had the agents *actually* given Mrs. Khomutov permission, then (1) that call presumably would have been heard on the audio recording (or at least referred to in some way); and (2) the agents would not have told her that the

opportunity to call "was not gonna come right now." A reasonable person in Mrs. Khomutov's position, who is not at liberty to even use their phone to make a call, would not feel free to leave or to terminate the interrogation. All in all, the Court finds that Mrs. Khomutov was subjected to custodial interrogation without receiving the requisite *Miranda* warnings, so her statements to the agents must be suppressed.

## IV. Conclusion

For the reasons discussed above, Michael Khomutov's motion to suppress is denied, and Julia Khomutov's motion to suppress is granted.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 19, 2020